**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 26-271** |
| **SETH S. JONES** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant Seth Jones embezzled approximately $322,798 from his employer, a Philadelphia-area non-profit company ("Non-Profit Company #1") that, through a subsidiary ("Non-Profit Company #2"), provides services to foster children and their caretakers. The defendant did this for over four years and in a number of different ways, but primarily by using his company credit card to pay for personal expenses, as such as domestic and international travel, gambling debts, Amazon purchases, rent, utilities, and car payments. In order to conceal his theft, the defendant submitted fake invoices and receipts into Non-Profit Company #2's accounting system and failed to submit supporting documentation for his unauthorized credit card charges. For these reasons described below, the government recommends a sentence of incarceration in the lower half of the 15- to 21-month advisory guidelines range, absent any basis for a departure addressed in the supplemental sealed attachment to this sentencing memorandum. The government also requests that the Court impose at least two years of supervised release, restitution in the amount of $322,798, and a forfeiture money of judgment of $322,798.

## I. PROCEDURAL BACKGROUND

On June 15, 2026, the government filed an Information charging the defendant with two counts of wire fraud, in violation of 18 U.S.C. § 1343. (ECF No. 1.) Before the Information was filed, the parties entered into a plea agreement pursuant to which the defendant agreed to

plead guilty to the two counts, waiving his right to be charged by Indictment. On July 24, 2026, the Court conducted a guilty plea hearing, during which the Court accepted the defendant's guilty plea pursuant to the plea agreement.

## II. SENTENCING CALCULATION

### A. Statutory Maximum Sentences

The statutory maximum penalty for each of the two wire fraud counts is 20 years' imprisonment, a 3-year term of supervised release, a $250,000 fine or a fine of not more than the greater of twice the gross gain or twice the gross loss, and a $100 special assessment. The total maximum sentence is 40 years' imprisonment, three years' supervised release, a fine of $500,000 or of not more than the greater of twice the gross gain or twice the gross loss, and a $200 special assessment.

### B. Sentencing Guidelines Calculation

The PSR correctly calculates the defendant's applicable advisory guideline range as 15 to 21 months' imprisonment (total offense level 14 and criminal history category I).

The defendant is in criminal history category I because he has no criminal history.

The Probation Office calculated the defendant's offense level as follows:

- The base offense level offense is 7.
- 10 points are added because of fraud loss between $200,000 and $350,000.
- 2 points are added for specific offense characteristics—misrepresentation or other fraudulent action during the course of a bankruptcy proceeding. This enhancement applies as a result of the defendant making approximately $31,775.00 in unauthorized ACH payments from Non-Profit Company #2's bank account after Non-Profit Company #2 filed for bankruptcy.

- 3 points are subtracted for acceptance of responsibility and timely plea.
- 2 points are subtracted due to the defendant not having any criminal history points.

**C. Analysis of 18 U.S.C. § 3553(a) Factors**

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 128 S. Ct. 586, 596 (2007). Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses. This Court must also consider all of the sentencing considerations set forth in Section 3553. Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553. The relevant § 3553 factors will be discussed in turn.

1. The Nature and Circumstances of the Offense

The defendant's crimes are very serious. For more than four years, from approximately May 2021 through approximately June 2025, the defendant abused his positions at Non-Profit Company #1 and its subsidiary, Non-Profit Company #2—organizations dedicated to administering public health programs and providing critical social and health services to foster

children and families—to embezzle approximately $322,798 in funds that were intended to support vulnerable populations.

This was not a crime of opportunity or spontaneity. It was a prolonged, deliberate, and calculated scheme that spanned several years. It was a scheme the defendant expanded, refined, and actively concealed, through manipulating the organizations' accounting systems.

The defendant worked on matters relating to Non-Profit Company #2 throughout his ten-year tenure with Non-Profit Company #1, and, beginning in or about July 2023, he served as Managing Director of Finance for Non-Profit Company #2. The defendant was fully aware of Non-Profit Company #2's policies governing credit card usage. Indeed, he signed the written policy on October 18, 2019, expressly acknowledging that company credit cards were for business purposes only, that personal use required reimbursement, and that employees were required to submit monthly documentation, including coding and receipts, for each expense.

The defendant repeatedly violated these policies and devised a scheme to embezzle funds from Non-Profit Companies #1 and #2 in two primary ways.

First, from May 2021 to June 2025, the defendant caused Non-Profit Companies #1 and #2 to pay approximately $291,023 in credit charges for the defendant's personal expenses. These charges included approximately $180,749 in payments to his own company, Class X Unlimited LLC, which performed no work of any kind for Non-Profit Companies #1 or #2, along with tens of thousands of dollars in personal travel, Amazon purchases, rent, utilities, and car payments. For the $180,749 paid to Class X Unlimited, the defendant used the funds for similar purposes and also to feed his gambling addiction. To conceal these unauthorized charges, the defendant repeatedly made false entries in Non-Profit Company #2's accounting system (Expensify), claiming that his personal purchases were legitimate business expenses and

attaching fake invoices and receipts to support these fabricated entries. He also exploited a known weakness in the Expensify system: if he failed to submit necessary documentation, a charge remained "Open" and was never sent to his supervisor for review. As a result of this manipulation, hundreds of thousands of dollars of his charges remained in "Open" status, thus avoiding supervisor review and enabling him to perpetuate these fraudulent charges.

In numerous instances, the defendant affirmatively falsified the identity of vendors in Expensify. For example, as charged in Count One, on or about April 5, 2024, he claimed that a $4,957 credit card charge was for Amazon business expenses when, in truth, the charge was a payment to Class X Unlimited. As charged in Count Two, on or about December 13, 2024, he falsely represented that a $4,275 credit card charge was for gift cards for Non-Profit Company #2's clients and uploaded a fabricated invoice purporting to be from a grocery store. In reality, that charge, too, was a payment to Class X Unlimited.

Second, from about August 2024 to about October 2024, the defendant caused Non-Profit Company #2 to send approximately $31,775 in ACH payments to bank accounts belonging to Class X Unlimited and himself. These payments were made from Non-Profit Company #2's TD Bank account, which was designated during bankruptcy proceedings as the entity's operating debtor in possession account. This conduct occurred after the defendant himself submitted a sworn declaration to the Bankruptcy Court on May 1, 2024, attesting to the integrity of Non-Profit Company #2's financial operations and the necessity of continuing to use its bank accounts during the bankruptcy. The defendant's theft during an active bankruptcy proceeding represents an aggravating factor, as evidenced by the two-level enhancement for this conduct.

The defendant's scheme was ultimately uncovered in the summer of 2025, when Non-Profit Company #1's bank identified irregularities in Non-Profit Company #1's credit card

accounts. Non-Profit Company #1 retained a law firm and engaged forensic accountants to investigate, which led to the discovery the defendant's embezzlement of hundreds of thousands of dollars in unauthorized credit card charges and his manipulation of Expensify, through the submission of false invoices, providing fake vendor names, and failing to provide supporting documentation for credit card charges.

When confronted in September 2025 by Non-Profit Company #1's CEO and outside counsel, the defendant admitted that Class X Unlimited did not perform any work for the companies and that he had created fake invoices and uploaded them into Expensify, and he apologized for his conduct. During a subsequent FBI interview on January 29, 2026, the defendant again admitted that he knowingly used his Non-Profit Company #2 credit card for personal expenses.

The nature and circumstances of the defendant's offense—its duration, scope, planning, concealment, and impact on publicly funded social-service organizations—warrant a sentence of incarceration. However, that sentence may be mitigated somewhat by the defendant's early and complete acceptance of responsibility in this case. As discussed above, he admitted his conduct to the FBI during a voluntary interview. After being served with a target letter, the defendant also agreed to plead guilty to an Information in this case and also agreed to an order of forfeiture and restitution.

2. Defendant's History and Characteristics

The defendant is 46 years old. He is married, does not have any children, and resides in Philadelphia with his spouse. PSR ¶ 47–57.

The defendant is highly educated and has had a history of steady employment. He earned a diploma from Edward W. Bok High School in Philadelphia in 1999. He subsequently

earned a bachelor's degree in accounting and business in 2005 from Peirce College, and a master's degree in business administration in 2017 from Strayer University. The defendant has worked for Non-Profit Companies #1 and #2 from approximately 2015 through 2025, when he was terminated due to the discovery of the instant offense. Additionally, the defendant was the owner and operator of Class X Unlimited, a financial consulting company, from 2020 until February 2026. From February 2026 until July 2026, he was employed by a company in Bethlehem, Pennsylvania as the vice president of finance. He is currently working 25-30 hours a week as an Uber driver. The defendant reports he intends to remain in the finance field, even if he has to do so by working independently due to his felony conviction. PSR ¶ 73–81.

There are several mitigating factors related to the defendant's characteristics. As noted above, the instant offense is his only criminal conviction. The defendant accepted guilt very early in this case, beginning when he admitted to much of him criminal conduct during a voluntary interviews with Non-Profit Company #1 and the FBI in September 2025 and January 2026, respectively. The defendant later agreed to plead guilty pursuant to an Information. As a result, the government never had to present its case to a grand jury, and the Court did not need to preside over a trial or rule on any pretrial or posttrial motions. The defendant's early guilty plea allowed the government and Court to allocate their resources efficiently during the pendency of this case.

In sum, while the defendant's crimes are undoubtedly serious, the Court should consider the defendant's lack of criminal history and early acceptance of responsibility in fashioning the sentence.

3. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

There is a strong need for the Court's sentence to promote respect for the law, reflect the seriousness of the offense, and provide just punishment for the offense. As the Court can see, misusing a company credit card, creating false invoices, and manipulating accounting systems can be quite lucrative. A sentence of incarceration would send the appropriate message that embezzlement is a serious offense that warrants appropriate punishment, even for a person with no prior criminal history.

4. The Need to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of Defendant.

To a white-collar defendant, a sentence of probation or home detention, fines, and restitution is the cost of doing business. The government does not believe that those penalties alone are effective deterrence. The government believes that if the defendant knew that he would go to jail for his crimes, he never would have engaged in this fraud scheme. That is effective deterrence and that is why a sentence of incarceration is needed here.

Moreover, the defendant's criminal conduct was not a spur-of-the-moment, irrational act. Rather, his decision to repeatedly steal from his employer over a four-year period was the result of a deliberate, rational calculation: that the benefit of the fraud outweighed the risk of getting caught and being punished. As discussed above, the fraud scheme ended after Non-Profit Company #1's bank alerted the entity to irregularities in the defendant's credit card expenses. There is every reason to believe that the defendant would have continued to embezzle funds from Non-Profit Company #1 had he not gotten caught. For this reason, general deterrence is of paramount importance for white-collar offenses. As explained by the Eleventh Circuit:

> Because economic and fraud-based crimes are "more rational, cool, and calculated than sudden crimes of passion or opportunity," these crimes are "prime candidate[s]

> for general deterrence." Defendants in white collar crimes often calculate the financial gain and risk of loss, and white-collar crimes therefore can be affected and reduced with serious punishment.

*United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (*quoting in part* Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 WM. & MARY L. REV. 721, 724 (2005)); *see also* Joshua D. Blank, *In Defense of Individual Tax Privacy*, 61 EMORY L.J. 265, 321 (2011) ("Studies have shown that salient examples of tax-enforcement actions against specific taxpayers, especially those that involve criminal sanctions, have a significant and positive deterrent effect.").

A sentence in the lower half of the advisory guidelines range would match the gravity of the offense and be consistent with the object of deterrence. Moreover, such a sentence would send a message to other would-be white-collar criminals that imprisonment is a real prospect for those who steal from their employers, even those, like the defendant, who do not have any prior criminal record. *See also* USSG Ch. 1 Pt. A(4)(d) ("[T]he definite prospect of prison [for economic crime] . . . will serve as a significant deterrent, particularly when compared with pre-guidelines practice where probation, not prison, was the norm.").

5. <u>The Need to Provide Defendant with Treatment</u>

The government is not aware of any unique issues regarding education or vocational training or medical care for the defendant that the Court should consider when imposing a sentence pursuant to 18 U.S.C. § 3553(a)(2)(D), aside from the fact that the defendant should continue to receive appropriate treatment for a gambling addiction.

6. <u>The Need to Avoid Unwarranted Sentencing Disparities Among Defendants With Similar Records Who Have Been Found Guilty of Similar Conduct.</u>

There are no co-defendants in this case. Government counsel recently prosecuted a similar case in which a defendant who embezzled approximately $438,000 from her employer (a

family-run company in Huntingdon Valley) received a sentence of 16 months' imprisonment, after pleading guilty to an information. *United States v. Vasquez*, E.D. Pa. Case No. 25-cr-44.

7. The Need to Provide Restitution to Any Victims of the Offense.

The defendant's crime resulted in financial loss to Non-Profit Companies #1 and #2. The defendant has agreed via his plea agreement to pay restitution in the amount of $322,798, which represents the money that he embezzled. The government requests that the Court impose this amount of restitution as part of the judgment.

**D. Supervised Release**

Pursuant to USSG §§ 5D1.1 and 5D1.2, as amended effective November 1, 2025, the Court is directed to conduct an "individualized assessment" when deciding whether to impose a term of supervised release, and if supervised release is imposed, how long the term should be. The Court is further directed to state in open court its reasons for imposing or not imposing a term of supervised release, and its reasons for the length of a term imposed. Further, Section 5D1.3 sets forth mandatory conditions of a term of supervised release, and "discretionary conditions" that the Court may impose, following the same individualized assessment.

The guideline commentary, consistent with 18 U.S.C. § 3583(c), provides that the "individualized assessment" should rest on consideration of the same sentencing factors under 18 U.S.C. § 3553(a) that are considered with respect to a term of imprisonment, with the exception of Sections 3553(a)(2)(A) (the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense") and 3553(a)(3) ("the kinds of sentences available"), which do not apply with regard to supervised release decisions.

The government requests a term of supervised release of at least 2 years. While the defendant does not have a criminal record, the conduct was serious and further supervision after release from custody is warranted to aid his reentry to society and to protect the public. A term of supervised release in this case advances the goals of sentencing to deter criminal conduct, § 3553(a)(2)(B), protect the public, § 3553(a)(2)(C), assure that the defendant continues to pursue vocational efforts that promote rehabilitation, § 3553(a)(2)(D), and pays any remaining forfeiture amounts. This assessment also supports imposition of all the mandatory and standard conditions of supervised release listed in USSG § 5D1.3 in addition to the special condition regarding access to financial information (USSG § 5D1.3(b)(3)(C)), given the Court's forfeiture order.

## III. CONCLUSION

The government's recommendation regarding sentencing appears in the sealed attachment.

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s/ Francis A. Weber*
FRANCIS A. WEBER
JOHN IANNACONE
Assistant United States Attorneys

Dated: October 26, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the Government's Sentencing Memorandum has been served by electronic mail and ECF upon the following:

Zak T. Goldstein (ztg@goldsteinmehta.com)

*/s/ Francis A. Weber*
FRANCIS A. WEBER
Assistant United States Attorney

Date: October 26, 2026